UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
BARRACK, RODOS & BACINE,

                            Plaintiff,

                                            Case No. 08 cv 02152 (PKL)


            -against-


BALLON STOLL BADER & NADLER, P.C.,

                            Defendant.
--------------------------------------------------------x

MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR
<u>PRELIMINARY INJUNCTION</u>

**<u>Preliminary Statement</u>**

        This Memorandum of Law is respectfully submitted by the Defendant, Ballon

Stoll Bader & Nadler, P.C. ("BSBN") in opposition to the application by Barrack, Rodos

& Bacine ("BR&B") for an Order enjoining the continued prosecution against BR&B of

an Arbitration Proceeding pending before the American Arbitration Association under

Case no. 13 194 01780 07 (the "Arbitration").

        BR&B belatedly brings this application, after having expressly and purposefully

submitted all of the issues raised herein for determination by the Arbitrator.  BR&B must

be denied this "second bite at the apple," having already elected its remedy.  Indeed, the

procedural requirements dictate that BR&B has completely "missed the boat" with

respect to the requested relief, expressly consented to a determination by the Arbitrator

on the "threshold issues" presented, and must now be held to the stringent standards

applicable to vacatur of Arbitration Awards --- standards which cannot be met.

**Statement of Facts**

BSBN relies upon the facts set forth in the accompanying Declaration of Susan Schneiderman, dated March 11, 2008, including the Exhibits A through G annexed thereto, in support of the legal conclusions reached in this Memorandum of Law.  All abbreviations and appellations used in that Declaration are utilized herein as well.

**POINT I**

**BR&B CANNOT
SUCCEED ON THE MERITS**

The *only matter* before this Court in assessing "likelihood of success on the merits" is whether the Court is likely to hold in this action that BR&B may not be compelled to Arbitrate BSBN's claims against it.  BR&B, as demonstrated below, has set forth absolutely no facts or authority from which it could be concluded that they are likely to succeed.  To the contrary, as described in the Declaration of Susan Schneiderman, Esq., BR&B's own actions require a finding that BR&B must be compelled to arbitrate the underlying claims.

**A.  The Gateway Issue of Arbitability was Properly Before the Arbitrator.**

**(a)** The Federal Arbitration Act Controls.

 The Federal Arbitration Act ("FAA"), 9 U.S.C. §1, *et seq.*, applies to questions of arbitrability whenever a contract "affecting interstate commerce" or "involving interstate commerce" contains an arbitration provision.  This is so notwithstanding the applicability of substantive New York Law to the merits of the underlying dispute.  Diamond Waterproofing Sys. v. 55 Liberty Owners Corp., 4 N.Y.3d 247 (2005).  Since the Of Counsel Agreement necessarily pertained to and contemplated commencement of

litigations in a variety of venues within the United States, that contract clearly falls within FAA coverage.  In fact, the Intel Suit, which underlies this dispute, was litigated in the United States District Court for the District of Delaware.

Under substantive New York Law, the question of whether arbitrability is to be determined under the laws of New York or under the FAA turns on the language of the subject arbitration agreement.  Where the agreement provides for the application of New York law to both "the agreement *and its enforcement*" then the law of New York, applies. <u>Id.</u> at 253.  In the absence of a specific provision for application of New York law to "enforcement," then the FAA applies. <u>Id.</u>  Here, the Of Counsel Agreement provides only that it "shall be governed by the Laws of the State of New York," therefore invoking the FAA with respect to determination of substantive arbitrability.

(b) <u>Jurisdiction to Determine the Gateway Issue Herein Rests with the Arbitrator.</u>

The United States Supreme Court has interpreted the phrase "question of arbitrability" to be limited to the "narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, **where they are not likely to have thought that they had agreed that an arbitrator would do so**, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.[emphasis added]" <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83-84, 123 S.Ct. 588 (2002).

On the other hand, the "presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability' " <u>Id.</u> at 537 U.S. 84, *quoting* <u>Moses H. Cone Mem. Hosp. v Mercury Constr. Corp.</u>, 460 US 1, 25 (1983).

3

Questions concerning "'whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are [generally] for the arbitrators to decide'" *Id.* at 537 U.S. 85.

Where the parties have **"clearly and unmistakably"** agreed otherwise, the general rule that substantive questions of Arbitrability, such as whether a non-signatory can be bound to arbitrate, is abrogated in favor of a determination by the Arbitrator. *Id.* at 537 U.S. 84; AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) [emphasis added]; *see also,* First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920 (1995).

Here, BR&B was presented with, and passed up, no fewer than *five (5) discrete opportunities* to seek a judicial stay of arbitration or to call into question the jurisdiction of the Arbitrator to decide questions of Arbitrability:

> **1st.** *Upon receipt of the Demand for Arbitration in August 2007.*
>
> **2nd.** *Following receipt of the AAA's September 25, 2007 letter, wherein Mr. Bacine was expressly advised of the* <u>*necessity*</u> *of obtaining a judicial stay in order to prevent further proceedings.*
>
> **3rd.** *Following receipt of the AAA's November 5, 2007 letter, again advising Mr. Bacine that the matter would proceed via the arbitrator absent a judicial stay.*
>
> **4th.** *During and following the December 3, 2007 Conference Call.*
>
> **5th.** *During and following the December 17, 2007 Conference Call.*

In each instance, Mr. Bacine *rejected* the suggestion that he seek a stay of the proceedings, opting instead for the alternate avenue suggested by the AAA, *i.e.* "**to raise**

**this issue, upon appointment of the arbitrator."** In fact, Mr. Bacine expressly instructed Ms. Metz to **"forward the exchange of correspondence, including this letter, to the arbitrator appointed to hear the matter,"** an instruction antithetical to the position that the Arbitrator is without jurisdiction to decide. (See Schneiderman Declaration, Exhibit E).

Mr. Bacine later confirmed BR&B's intention to submit the question of arbitrability to the Arbitrator when he agreed, first, to submit the following question to Arbitrator Muccia: "**whether the Barrack firm is properly a party in this arbitration Case, notwithstanding that it has never signed an applicable agreement to arbitrate."** After raising, for the first time, the question of the Arbitrator's jurisdiction to decide arbitrability in its initial submission to Arbitrator Muccia (Exhibit 2 to the Moving Papers), Mr. Muccia further consented to the submission by BSBN, and receipt by Arbitrator Muccia, of responsive memoranda with respect to the following question: "**whether the Arbitrator has authority or jurisdiction to rule on the issue of whether the Barrack firm is a party to this case…..where the Barrack firm is not a signatory to an arbitration agreement."**

There can be no doubt that BR&B, a firm of self-professed sophistication and ability, "**clearly and unmistakably" agreed to submit the question to Arbitrability to Arbitrator Muccia.** Howsam v. Dean Witter Reynolds, Inc., *supra.* BR&B, explicitly and implicitly, requested that Arbitrator Muccia decide.

BR&B's express request that the Arbitrator decide the issue of Arbitrability and Mr. Bacine's neglect over the course of five (5) months to exercise any right to move the Court for a Stay on the ground that BR&B was not bound to arbitrate, must be construed

as (1) BR&B's agreement to "arbitrate arbitrability" and (2) waiver of BR&B's right to object.

## B. BR&B is Bound by the Arbitration Clause Contained in the Of Counsel Agreement.

While the general rule is that non-signatories to an agreement to arbitrate cannot be compelled to arbitrate, there are recognized grounds for enforcing an arbitration agreement against a non-signatory. Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2nd Cir. 1995). The Second Circuit opined in Thomson-CSF that it is "**clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.' *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980).**" The Court expressly recognized five (5) theories arising under "ordinary principles of contract and agency" pursuant to which a non-signatory may be bound to arbitrate, namely: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Id. at 776.

(a) BR&B is Estopped from Resisting Arbitration

"Under the estoppel theory, a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement.'" MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC, 268 F.3d 58 (2nd Cir. 2001) Application of an estoppel theory is dependant upon whether the non-signatory received a "direct benefit" from the agreement containing the arbitration clause. American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2nd Cir. 1999). Direct benefits have been found to include use a trade name granted

by an agreement (Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060 (2nd

Cir. 1993)), significantly lower insurance rates and the ability to sail under the French

flag by reason a contract between a shipbuilder and an accrediting agency. American

Bureau of Shipping v. Tencara Shipyard S.P.A., supra at 353.

In contrast, benefits are considered indirect when "the agreement was not the

direct source of the benefit… [flowing instead] from the non-signatory's exploitation of

the contractual relation created through the agreement…" MAG Portfolio Consult,

GmbH v. Merlin Biomed Group, LLC, supra at 61-62.

> **Under the estoppel theory, a company "knowingly
> exploiting [an] agreement [with an arbitration clause can be]
> estopped from avoiding arbitration despite having never
> signed the agreement." [Thomson-CSF, S.A. v. Am. Arbitration
> Ass'n, 64 F.3d 773, 778 (2d Cir. 1995)]. Guided by "ordinary
> principles of contract and agency," we have concluded that
> where a company "knowingly accepted the benefits" of an
> agreement with an arbitration clause, even without signing the
> agreement, that company may be bound by the arbitration
> clause. Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9
> F.3d 1060, 1064 (2d Cir. 1993) (internal quotation marks and
> citation omitted). The benefits must be direct -- which is to say,
> flowing directly from the agreement.  Thomson, 64 F.3d at 779.
> Deloitte, for example, concerned an agreement containing an
> arbitration clause which governed the terms of use of a trade
> name. A nonsignatory who had received a copy of the
> agreement, raised no objections to it and made use of that
> trade name pursuant to the agreement was estopped from
> arguing it was not bound by the arbitration clause in the
> agreement.  Deloitte, 9 F.3d at 1064.**

Here, BSBN's claims against BR&B arise directly from the Of Counsel

Agreement, requiring a finding that BR&B is bound.

The Of Counsel Agreement provided the contractual basis pursuant to which A.

Arnold Gershon, P.C. {"AAG") became entitled to receive a portion of the fees generated

by certain stockholder derivative actions and class actions which Gershon introduced to

BSBN. Initially, those fees were characterized as "the sole property of [BSBN]." In June 2006, several months before terminating the Of Counsel Agreement, Gershon secured a modification to the language of the Of Counsel Agreement by which BSBN and AAG each retained a proprietary interest in the fees, "as their interest are expressed in" the Of Counsel Agreement. The Of Counsel Agreement clearly provided for post termination survival of the fee provisions with respect to any fees received on account of services provided during the term of the agreement.[1] Under Article "Ninth" of the Of Counsel Agreement,

> **(b) All collections for services rendered prior to the termination of this Agreement and received by [BSBN] or [Gershon], after the termination date of this Agreement, shall remain the property of the parties as their interests are expressed in this Agreement. [Gershon] and [BSBN] shall share in said collections as set forth in Fee Schedule "A" hereof.**

As such, Gershon became a contractual trustee with respect to any fees received by Gershon post-termination in which BSBN held an interest. Since BR&B's rights with respect to those fees flow from the assignment by Gershon, BR&B's rights are co-extensive with Gershon's interest under the Of Counsel Agreement.

Mr. Bacine acknowledges that, as of November 2006, he knew that it was necessary, in connection with Gershon's departure from BSBN, for Gershon to "work out an arrangement to divide equitably the cases that he had brought to and was working on at Ballon Stoll, leaving some and taking some." [Bacine Aff. ¶10]. Mr. Bacine had reason to known at that time that Gershon was operating under an agreement with BSBN. Upon joining BR&B, Arnold entered into an agreement whereby "all fees generated by

---

[1] The amendment did not alter the practical application of the Agreement. Instead of 100% ownership of the fees by BSBN, with the obligation to compensate Gershon, the parties each owned a proportionate share of the fees.

you [Mr. Gershon] on behalf of [Arnold's] clients and [BR&B's] clients during your association with [BR&B] are the property of Barrack Rodos & Bacine."

Even were BR&B justified in ignoring the obvious by neglecting to request and review Gershon's agreements with BSBN, it is undisputed that, no later than "late April or early May 2007" Mr. Bacine learned that "Ballon Stoll claimed to retain a financial interest in one of the cases [Arnold] brought with him, specifically Intel."  By mid-May, 2007, Mr. Bacine had become privy to "documents showing his agreement with Ballon Stoll to divide the cases that Gershon had been working on at that firm" and received "a copy of the agreement that Gershon signed that contained the arbitration clause." [Bacine Aff. ¶11].  As acknowledged in his Affidavit, Mr. Bacine knew by the middle of May 2007 "there was no meeting of the minds" between Gershon and BSBN regarding the disposition of the Intel Fees. [Bacine Aff., ¶11].  At that time, the Intel Fees had been neither awarded by the Court nor received by BR&B. [Bacine Aff., ¶11].

In summary, by April, 2007, BR&B knew that BSBN claimed a contractual interest in the Intel Fees.  By mid-May, 2007, BR&B was aware of the precise language and terms of the Of Counsel Agreement, including BSBN's ownership of a percentage in fees generated during the term, and was fully aware of the nature of the dispute between BSBN and Gershon regarding the disposition of fees received in the Intel matter post-termination.

Finally, BR&B, a firm of sophisticated attorneys, knew by May 2007 at the very latest that any fees received by virtue of the assignment of Intel fees from Arnold flowed to Arnold and, hence, to BR&B, as a direct consequence of the Of Counsel Agreement, to which BR&B has never lodged objection.  **Moreover, and of critical importance,**

**BR&B knew, by virtue of the language of the Of Counsel Agreements and the documented dispute between Gershon and BSBN, that BR&B's entitlement, if any, to retain that portion of the Intel fees that contractually belonged to BSBN, flowed solely and directly from Gershon's factual and legal position regarding the interpretation and implementation of the Of Counsel Agreement.**

In a recent decision handed down by Judge Sand in <u>Republic Of Ecuador v. Chevrontexaco Corp</u>, 04 Civ. 8378, SDNY, 06/19/07 (6/26/2007 N.Y.L.J. 26, (col. 1)) (copy attached), the validity of the <u>Thomson-CFS</u> criteria was expressly confirmed:

> **Under federal common law, the Second Circuit 'has recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.' Thomson-CSF, S.A. v. American Arbitration Association, 64 F.3d 773, 776 (2d Cir. 1995). '[A] willing signatory….seeking to arbitrate with a non-signatory that is unwilling…… must establish at least one of the five theories described in Thomson-CSF. 'Merrill Lynch Inv. Managers, 337 F.3d [125,] at 131 [(2d Cir 2003)…Of the five Thomson-CSF theories, the most likely to apply in this case is estoppel. 'A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause.' American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (citing Thomson-CSF, 64 F.3d at 778-79). Direct benefits are those 'flowing directly from the agreement…**

Here, BR&B derived a "direct benefit" from the Of Counsel Agreement.   BR&B Barrack has succeeded to the monetary benefits of that agreement which would otherwise have inured solely to Gershon.  Since BR&B is necessarily claiming a proprietary interest in the Intel Fees by virtue of the Of Counsel Agreement and rights derived directly from Gershon, Barrack must be bound to the arbitration clause which binds the parties to that agreement.

(b) Assumption and Successorship: Application of the AT&S v. Odyssey Logistics Analysis – New York's *de facto* Merger Doctrine

Applying foregoing principles, the Appellate Division, Second Department in AT & S Transp., LLC v. Odyssey Logistics & Technology Corp., 22 A.D.3d 750, 803 N.Y.S.2d 118 (2nd Dep't 2005) found that under circumstances that evince a successorship, the non-signatory successor may be compelled to arbitrate pursuant to an arbitration agreement between the predecessor and a third party.   There, AT&S sought to compel Odyssey to arbitrate pursuant to an agreement which had been entered into between AT&S and two other parties.  The two parties to AT&S' Arbitration Agreement subsequently entered into an "asset transfer agreement" with Odyssey.  When AT&S sought to enforce its arbitration agreement as to Odyssey, Odyssey resisted, claiming it was not bound "because it was not a party, an assignee, or a successor" to the AT&S agreement.

The Appellate Division, Second Department upheld the trial court's determination that Odyssey was bound by the arbitration agreement, fining that a "*de facto* merger had resulted from the asset transfer agreement.  In doing so, the Court held as follows:

> **The hallmarks of a de facto merger are the "[c]ontinuity of ownership; cessation of ordinary business and dissolution of the predecessor as soon as possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and, a continuity of management, personnel, physical location, assets, and general business operation" (Fitzgerald v. Fahnestock & Co., 286 A.D.2d 573, 574, 730 N.Y.S.2d 70). These factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor (see Nettis v. Levitt, 241 F.3d 186; City of New York v. Pfizer & Co., 260 A.D.2d 174, 688 N.Y.S.2d 23). [emphasis added].**

*Id.* at 22 A.D.3d 752.

Discussing the factors considered in reaching its determination, the Court opined:

> **…AT & S presented sufficient evidence to establish all four factors needed to demonstrate the existence of a de facto merger. Pursuant to the transfer agreement between Odyssey, Rely, and Acquisition Corp., in consideration for the transfer of shares of Odyssey stock, substantially all of the assets of Rely and Acquisition Corp. were purchased or licensed by Odyssey. The real property of the predecessor corporation was transferred or assumed by Odyssey. Odyssey offered employment to its predecessor's employees, hired two of its predecessor's management personnel, assumed the contracts of independent contractors, agreed to honor the predecessor's customer service contracts, and received the predecessor's business insurance policy. …The fact that Rely did not immediately liquidate is not dispositive. So long as the acquired corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made (see Fitzgerald v. Fahnestock & Co., supra at 576, 730 N.Y.S.2d 70;Ladenburg Thalmann & Co. v. Tim's Amusements, 275 A.D.2d 243, 248, 712 N.Y.S.2d 526).**

*Id.* at 22 A.D.3d 752-753.

Here, the following undisputed facts require a finding that Barrack must be bound by the arbitration provision of the Of Counsel Agreement:

- Upon termination by AAG of the Of Counsel Agreement, Arnold simultaneously joined Barrack.

- Arnold brought with him to Barrack AAG's and Gershon's ongoing caseload consisting of matters in which AAG and/or Arnold acted as counsel through BSBN.

- BR&B extended offers of employment to two former employees of BSBN, an associate attorney and a secretary, both of whom had been specifically and nearly exclusively assigned to staff Gershon's cases.

- BR&B immediately acquired ownership of "all fees generated by" Arnold during his association with Barrack.

- BR&B promptly replace BSBN as "of counsel" in the Intel Suit and, upon information and belief, with respect to all other cases acquired by BR&B on which Gershon was listed as "of counsel."

- Arnold, upon joining BR&B, immediately abandoned AAG as the entity through which he practiced law, practicing thereafter exclusively through BR&B.

Clearly, the end result of Arnold's move was the absorption by BR&B, and continued operation by Barrack, of substantially all of AAG's assets, *i.e.* the AAG/Gershon law practice.   This is confirmed through Arnolds representations and statements set forth in his correspondence to BSBN regarding the Intel Fees.  Neither Barrack nor Gershon can avoid the clear intent of the parties to the Of Counsel Agreement that any disputes concerning the distribution of fees between Gershon and BSBN be resolved by Arbitration.  (See, <u>International Fidelity Insurance Company v. Andsaratoga Springs Public Library</u>, 236 A.D.2d 719 (3rd Dep't 1997).  Barrack has expressly assumed the position of Gershon with respect to those fees or the clear language of the Of Counsel Agreement, declaring its binding effect on Gershon's successors

## POINT II

## NO IRREPARABLE HARM
## HAS BEEN SHOWN

The Movants fail to point to any authority which would support the relief that they now request. While it is true that many authorities have ruled that "irreparable harm" flows from being forced to arbitrate in the absence of an agreement to do so, the case law cited by BR&B is distinguishable in critical factual respects.

For example, in Masefield AG v. Colonial Oil Industries, Inc., 2005 WL 911770 (S.D.N.Y. 2005), this Court's decision was guided and driven, at least in part, by the fact that "on January 31, 2005, the ICC informed plaintiffs that it was referring the threshold issue of arbitrability to the Tribunal. As a result, plaintiffs filed the instant action on February 17, 2005, seeking (1) injunctive relief barring defendant from pursuing any arbitration against them, and (2) a declaratory judgment that they have no agreement to arbitrate with defendant and are not bound to arbitrate with defendant."

Here, on the other hand, the Plaintiffs expressly acquiesced to submission of the threshold issue of arbitrability to the arbitrator. Now, unhappy with the decision, the Plaintiff seeks, not to vacate the award but to stay arbitration.

## POINT III

## THE BALANCE OF EQUITIES
## FAVORS DENIAL OF THE RELIEF

Simply put, there is no basis upon which BR&B can claim entitlement to the benefit of an equity balancing process in this instance. If the injunction is granted, then BR&B will likely be required to post security in the amount of the Intel Fees. If, at

arbitration, BSBN is found to be the owner of a portion of those fees, then so much of the assignment by Arnold to BR&B as included BSBN's interest is void. If BR&B intends to defend based upon the very claims being raised in the arbitration by Gershon, then they must be found to have benefited directly from the Of Counsel Agreement.

## Conclusion

BR&B failed and refused to seek a judicial stay and requested that the Arbitrator determine Arbitrability. BR&B knowingly retained the benefits of Gershon's Of Counsel Agreement with BSBN. For all of the reasons stated herein, the Arbitrator properly exercised jurisdiction to decide the issues of Arbitrability and properly found BR&B is bound by the arbitration agreement. Accordingly, the relief requested must be denied in all respects.

Dated: New York, New York
      March 11, 2008

                    Respectfully submitted,
                    BALLON STOLL BADER AND NADLER, P.C.

                    By: _____
                        Susan Schneiderman (SS 9840)
                    Attorneys for Defendant
                    1450 Broadway
                    New York, NY 10018
                    Tel: (212) 575 7900
                    Fax: (212) 764 5060

16

Westlaw.

6/26/2007 NYLJ 26, (col. 1)                                                      Page 1
6/26/2007 N.Y.L.J. 26, (col. 1)

New York Law Journal
Volume 237
Copyright 2007 ALM Properties, Inc. All rights reserved.

Tuesday, June 26, 2007

Decision of Interest

SOUTHERN DISTRICT

PetroEcuador Not Bound by 1965 Agreement; Chevron Loses Bid for Help With
Cleanup's Cost

District Judge Leonard B. Sand

REPUBLIC OF ECUADOR v. **CHEVRONTEXACO** CORP, 04 Civ. 8378, Decided 06/19/07 --

Appearances:

Plaintiffs, Counterclaim Defendants

Charles MacNeil Mitchell

Winston & Strawn LLP (NY)

New York, NY

Eric Weston Bloom

Sarah M. Hall

Tomas Leonard

A. Manuel Garcia

Nicole Y. Silver

Winston & Strawn LLP (DC)

Washington, DC

Defendants, Counterclaim Plaintiffs

Thomas F. Cullen, Jr.

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                                        Page 2
6/26/2007 N.Y.L.J. 26, (col. 1)

Gregory A. Castanias

Louis Karl Fisher

Michael L Kolis

Jones Day (DC)

Washington, DC

Thomas E. Lynch

Jones Day

New York, NY

Before this Court is a hearing pursuant to Rule 44.1 of the Federal Rules of Civil
Procedure to determine issues of Ecuadorian law prior to ruling on plaintiffs'
motion for summary judgment entering: (a) judgment on plaintiffs' claims; (b)
dismissing defendants' counterclaims; (c) permanently enjoining and staying
defendants from continuing any arbitration proceedings in this matter; and (d)
awarding plaintiffs such other and further relief as the Court deems just, as well
as defendant's motion for summary judgment dismissing plaintiff's claims for a
permanent injunction of arbitration. This Rule 44.1 hearing was ordered by the
Court to determine whether an Ecuadorian court presented with the 1965 Joint
Operating Agreement ('JOA') between Gulf Oil Company ('Gulf ') and the defendants'
predecessors would find, that plaintiff PetroEcuador's predecessor Compania Estatal
Petrolera Ecuatoriana ('CEPE') became bound by the JOA in 1974 after taking over
Gulf Oil's ownership interest.

Fed R. Civ. P. 44.1 Power

Federal Rule of Civil Procedure 44.1 governs how foreign law is determined in
federal court. It provides:

 A party who intends to raise an issue concerning the law of a foreign country
shall give notice by pleadings or other reasonable written notice. The court, in
determining foreign law, may consider any relevant material or source, including
testimony, whether or not submitted by a party or admissible under the Federal
Rules of Evidence. The court's determination shall be treated as a ruling on a
question of law.

 Fed. R. Civ. P. 44.1. Rule 44.1 was enacted in 1966. Prior to its enactment
foreign law was a question of fact; now it is a question of law, which means that
it may be determined at the summary judgment stage of litigation. See Louise Ellen
Teitz, The Use of Evidence in Admiralty Proceedings, 34. J. Mar. L. & Com. 97, 104
(Jan. 2003) (discussing the Federal Rules of Civil Procedure and methods of proof
of foreign law).

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                                    Page 3
6/26/2007 N.Y.L.J. 26, (col. 1)

Rule 44.1 places the burden on the party raising issues of foreign law to give
'notice by pleadings or other reasonable written notice.' 'Since in Rule 44.1 there
is no form specified for the notice, federal courts construe the requirement
liberally.' Teitz, 34. J. Mar. L. & Com. at 106. Both parties have over the course
of this litigation made clear the need to determine what was permitted under
Ecuadorian law in 1974 before the Court endeavored to undertake any analysis
whether PetroEcuador could be bound to the JOA under the United States federal laws
of estoppel. See The Republic of Ecuador v. **ChevronTexaco** Corp., 376 F. Supp. 2d
334 (S.D.N.Y. 2005) (hereinafter ROE I); The Republic of Ecuador v. **ChevronTexaco**
Corp., 426 F. Supp. 2d 159 (S.D.N.Y. 2006) (hereinafter ROE II).

 The advisory committee notes on Rule 44.1 suggest that courts are allowed great
leeway in making a foreign law determination and provide that traditional
evidentiary standards need not apply. Fed. R. Civ. P. 44.1, advisory notes ('The
new rule permits consideration by the court of any relevant material, including
testimony, without regard to its admissibility under Rule 43.'). To this end, the
Court undertook to determine pertinent Ecuadorian law at a foreign law hearing,
which commenced on May 21, 2007 and concluded on May 24, 2007. The Court permitted
each party ample time to brief the issues and allowed each party to present
voluminous expert testimony on the topic and to cross examine the opposing party's
experts.

 Both the Court's determination of Ecuadorian law and its partial ruling on the
motion for summary judgment are set forth below; a portion of the summary judgment
determination is set aside for the parties to reevaluate their posture.

 Factual Background

 This Court and other courts in the Second Circuit have, at multiple times and in
various incarnations over the past 14 years, dealt with the underlying Facts of
this case. They are set forth in greater detail in other opinions rendered by this
Court, see ROE I; ROE II, as well as by other courts in the Second Circuit when
faced with a suit by a group of indigenous people in the Republic of Ecuador
against the defendants in this case. See Aguinda v. Texaco, Inc., 303 F.3d 470 (2d
Cir. 2002); Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998)). A brief background
of the case follows, as well as the Facts pertinent to the issue presented here.

 In 1965 the government of Ecuador granted an oil concession (the 'Napo
concession') to Gulf and the Texaco Petroleum Company ('TexPet'). Pursuant to the
Napo concession Gulf and TexPet signed a Joint Operating Agreement (JOA) in 1965
for the drilling of the concession. Both Gulf and TexPet were American companies
domiciled in Ecuador, and represented by local Ecuadorian counsel; however, the JOA
was signed in Florida. The JOA provided for arbitration to be conducted pursuant to
AAA rules in New York, and is the basis of Chevron's alleged right to engage
plaintiffs in arbitration of the 1995 settlement agreement provisions.

 In 1972 Ecuador's military assumed control of the government. In an effort to
nationalize the state's oil industry, the government issued Supreme Decree No. 430
'which, inter alia, required TexPet and Gulf to agree to new oil concession
contracts with the Republic and to relinquish a substantial percentage of Napo
concession lands.' ROE I, 376 F. Supp. 2d at 339 (internal citations omitted). In

Copyright © 2008 The New York Law Pub. Co.

1974, 25 percent of Gulf's interest in the drilling of Ecuadorian oil was taken over by CEPE pursuant to a government edict following Supreme Decree No. 430, referred to by the parties as the '1974 Acta.' 'The 1974 Acta did not itself contain a clause providing for arbitration; it did, however, contain a clause stating that 'the totality of the activities that will develop in the Joint Operation will be regulated by an operating agreement entered into by the parties,' the effect of which the parties dispute.' [FN1] ROE I, 376 F. Supp. 2d at 340. The parties agree that neither CEPE nor PetroEcuador ever signed the 1965 JOA at this point, or at any other point going forward. [FN2] Therefore PetroEcuador can only be held to the terms of the JOA through the operation of law.

 For the next three years the parties drilled the fields, but by 1976 Gulf decided to sell its interest in the newest concession to CEPE. CEPE bought out the remainder of Gulf's interest on May 27, 1977. There was no mention of the JOA in CEPE's agreement to take over Gulf's interest. (See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 10.)

 From 1977 through 1991, when a new JOA was agreed upon, Texaco and PetroEcuador operated the oil fields in conjunction with each other, with Texaco serving as the operator. [FN3] The parties attempted, but ultimately were unable until 1991, to agree upon a new JOA at various points during this interim operating period. At the start of negotiations for a new JOA in 1974, Chevron included provisions requiring arbitration, which were removed at the behest of PetroEcuador. (Id. at 7.) Multiple drafts of new JOA's were exchanged by the parties over the 17 year interim period. (Id.) The question before the Court is whether an Ecuadorian Court would find that CEPE had assumed Gulf's rights and obligations under the JOA in 1974 so that arbitration before the American Arbitration Association ('AAA') in New York sought in 2004 would be mandated.

 The present dispute finds its origin in a 1993 lawsuit instituted in the Southern District of New York by a group of indigenous people in Ecuador who sued defendants **ChevronTexaco** and Texaco Petroleum Company (referred to herein as 'Chevron,' except where noted) to compel the cleanup of their community's environmental resources which they allege were damaged by waste remaining after years of oil drilling on the land. After years of litigation in the American federal courts, the case was dismissed at Chevron's request on the grounds of forum non conveniens by the Second Circuit, with the caveat that Chevron consent to jurisdiction for a renewed suit in Ecuador. Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002). The first attempt by indigenous Ecuadorian plaintiffs to sue Chevron is referred to by the parties as the 'Aguinda' litigation cases. [FN4] In 2003 the indigenous Ecuadorian plaintiffs renewed the Aguinda litigation seeking the same relief as that sought earlier, however this time from the courts of Ecuador. This renewed action is referred to by the parties as the 'Lago Agrio' action.

 While the Aguinda litigation was ongoing in this district the current plaintiffs and defendants signed a settlement in 1995 ('1995 Settlement ') wherein TexPet agreed to perform certain environmental cleanup in exchange for a release of claims by Ecuador and PetroEcuador; in 1998 the 1995 Settlement was declared to be fully performed and concluded and the Government and PetroEcuador released Chevron and any related companies from 'from any liability and claims by the Government of the Republic of Ecuador, PetroEcuador and its Affiliates, for items related to the obligations assumed by TEXPET in' the 1995 Settlement. See ROE I, 376 F. Supp. 2d

Copyright © 2008 The New York Law Pub. Co.

at 341-42 (internal citations omitted). [FN5]

Procedural History before this Court

 The essence of the case at hand comes down to who will pay for the costs of any
environmental cleanup which may be ordered by an Ecuadorian court at the behest of
the Lago Agrio plaintiffs: defendants or Ecuador and its state-owned oil company
PetroEcuador.

 On June 11, 2004, to determine who would bear the burden for the cleanup sought in
the Lago Agrio litigation, Chevron instituted arbitration proceedings with the AAA
seeking indemnification of any adverse judgments and associated costs of litigating
the Lago Agrio case, as well as contractual damages for violating the terms of the
1965 JOA.

 On October 15, 2004 plaintiffs commenced suit in New York Supreme Court seeking to
stay permanently the arbitration proceeding before the AAA; on October 22, 2004
defendants removed the case to the Southern District of New York. Chevron
counterclaimed alleging a breach of contract by Ecuador for failing to indemnify it
as it allegedly contracted to do pursuant to the 1995 Settlement.

 In ROE I, this Court denied Ecuador's motion for summary judgment. Chevron claimed
at the time, and continues to claim today, that PetroEcuador is estopped from
denying that it is bound to the JOA because it acted in a manner consistent with
the JOA in the day to day operation of the concession and received benefits from
operation during the years following 1974. The Court found that application of
federal common law to the question of whether Ecuador, a nonsignatory to the
original arbitration agreement was bound to arbitrate this dispute raised genuine
issues of material fact as to whether Ecuador could be bound through principles of
estoppel to the 1965 JOA. The Court wrote:

 Under federal common law, the Second Circuit 'has recognized five theories for
binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2)
assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.' Thomson-CSF,
S.A. v. American Arbitration Association, 64 F.3d 773, 776 (2d Cir. 1995). '[A]
willing signatory (such as [TexPet]) seeking to arbitrate with a non-signatory that
is unwilling (such as [PetroEcuador]) must establish at least one of the five
theories described in Thomson-CSF. ' Merrill Lynch Inv. Managers, 337 F.3d [125,]
at 131 [(2d Cir 2003)].

 Of the five Thomson-CSF theories, the most likely to apply in this case is
estoppel. 'A party is estopped from denying its obligation to arbitrate when it
receives [**61] a 'direct benefit' from a contract containing an arbitration
clause.' American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353
(2d Cir. 1999) (citing Thomson-CSF, 64 F.3d at 778-79). Direct benefits are those
'flowing directly from the agreement,' while 'the benefit derived from an agreement
is indirect where the nonsignatory exploits the contractual relation of parties to
an agreement, but does not exploit (and thereby assume) the agreement itself.' MAG
Portfolio Consultant, GMBH, v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir.
2001). 'To prevail, then, [Defendants] must show that [PetroEcuador] 'knowingly
exploited' the...contract and thereby received a direct benefit from the contract.'

Copyright © 2008 The New York Law Pub. Co.

Id. at 62 (quoting Thomson-CSF, 64 F.3d at 778).

ROE I, 376 F. Supp. 2d at 356. The Court then examined the applicable evidence and determined that there was a genuine issue as to the material fact of whether Ecuador was in fact estopped from arguing that it could not be bound to the 1965 JOA. [FN6]

The Court then held a hearing to determine whether there was a conflict of law between the laws of Ecuador and New York law in relation to the 1995 settlement which was raised in defendant's counterclaim and subject to a motion to dismiss held over from ROE I. Finding no conflict and therefore applying New York law to the breach of contract claim, the Court stated 'that any assessment of the intent of the parties in agreeing to the 1995 and 1998 releases must take into consideration the Ecuadorian law at the time of the releases and the Ecuadorian context in which the parties were acting.' ROE II, 426 F. Supp. 2d at 164.

The Current Dispute

Plaintiffs now claim that Ecuadorian law precludes any reasonable belief by Chevron that CEPE agreed to the JOA; this contention, if true, would in effect end the question of arbitrability in this case and make any analysis of the Facts of this case under the federal laws of estoppel not needed. Ecuador and PetroEcuador allege that the terms of the 1965 JOA cannot bind them to arbitration in New York because they were not signatories to the original contract and could not become a party to it, under (1) Ecuadorian government contract law, (2) the Ecuadorian constitution then in effect, or (3) can by their course of conduct be found to have assumed the terms of the JOA. Chevron disagrees as to the result under Ecuadorian law in all three areas.

While the Court previously stated that federal principles of the American law of estoppel would apply, it is impossible to properly analyze an estoppel claim in American law without reference to the underlying Ecuadorian law because estoppel, particularly when sought against a governmental entity or the government itself, can only lie where there is reasonable reliance.

Federal Law of Estoppel against the Government

As we have noted after a study of Second Circuit law, the federal common law of arbitration agreements would apply to this case. ROE I, 376 F. Supp. 2d at 353-56.

Neither party attempts to argue that PetroEcuador is bound (or not bound) to arbitrate by incorporation by reference, agency, or veil-piercing/alter ego. Instead, the parties concentrate their arguments on assumption by assignment and assumption by estoppel, meshing categories 2 and 5 of the Thomson-CSF analysis. Generally, a party may be bound to an arbitration clause only through 'ordinary principles of contract and agency' Thomson-CSF, 64 F.3d at 775. However, the laws differ when the party estopped is a government entity, as is the case with PetroEcuador.

Neither party cites any cases where estoppel is applied against a foreign government by an American court.

Copyright © 2008 The New York Law Pub. Co.

In Office of Pers. Mgmt. v. Richmond, 496 U.S. 414 (1990) the Supreme Court maintained its longstanding policy of not allowing estoppel claims to proceed against the American government in instances where the government's agent did not have authority. The Court held 'payments of money from the Federal Treasury are limited to those authorized by statute' and therefore erroneous oral and written advice from an agent of the government would not suffice for an estoppel claim. Id. at 415. Though the Court has not laid down a blanket rule precluding every estoppel claim, it has reversed every finding by a lower court of estoppel against the government. Id. at 422.

The Court refuses to tamper where Congress has not authorized expenditures in public contracts: ''not even the temptations of a hard case' will provide a basis for ordering recovery contrary to the terms of the regulation, for to do so would disregard 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'' Id. at 420 (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 385-86 (1947).).

The Court did not find persuasive arguments as to the faith the public would place in officials if their word was not binding:

To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most claims were rejected in the end, the burden of defending such estoppel claims would itself be substantial.

Also questionable is the suggestion that if the Government is not bound by its agents' statements, then citizens will not trust them, and will instead seek private advice from lawyers, accountants, and others, creating wasteful expenses. Although mistakes occur, we may assume with confidence that Government agents attempt conscientious performance of their duties, and in most cases provide free and valuable information to those who seek advice about Government programs.

Id. at 433.

The Court has left open the possibility 'in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government.' Id. at 421 (citing INS v. Hibi, 414 U.S. 5, 8 (1973) (per curiam). After reviewing a series of cases (primarily against the IRS) from various circuits (but not the Supreme Court) the Third Circuit articulated a test for determining whether there was the additional affirmative misconduct needed to find estoppel against the government:

Although the Supreme Court has neither rejected outright nor articulated a specific test for estoppel claims against the government, the foregoing case law illuminates certain factors beyond the traditional elements of estoppel that we should consider before estopping the IRS. Those factors are: 1) the impact of the estoppel on the public fisc; 2) whether the government agent or agents who made the misrepresentation or error were authorized to act as they did; 3) whether the governmental misconduct involved a question of law or fact; 4) whether the government benefitted from its misrepresentation; and 5) the existence of

Copyright © 2008 The New York Law Pub. Co.

irreversible detrimental reliance by the party claiming estoppel.

  Fredericks v. Commissioner, 126 F.3d 433, 448-49 (3d Cir. 1997) (emphasis added).
It is basic horn book law that for a claim of detrimental reliance to succeed, any
reliance leading to the detriment must be reasonable. (Restatement 2d of Contracts,
§90)

  Before an American court could hold that plaintiffs are estopped from denying that
they are bound to the 1965 JOA it would have to find any reliance by defendants on
the laws of Ecuador (by whose operation it seeks to bind a nonsignatory to a
contract) was reasonable. Where the law is unsettled or unclear, an American court
must determine how a court in Ecuador would rule on the law upon which the
defendant seeks to rely. Therefore, if the laws of Ecuador either precluded
contracting with the state without certain formalities, did not recognize estoppel
or arbitration, or in any way made it unreasonable for Chevron to assume the
existence of the JOA, then there is no way for Chevron to estop CEPE from denying
an obligation to arbitrate. In the event that the JOA is not binding on
PetroEcuador summary judgment would be appropriate, as defendants could prove no
genuine issue as to any material fact regarding an agreement to arbitrate in New
York.

  Today the Court holds that an Ecuadorian court looking at the arbitration
provision in the 1965 JOA would find it not binding upon PetroEcuador for the
reasons set forth below.

Ecuadorian Law Relied Upon by the Parties

  The parties agree that CEPE did not sign the 1965 JOA, a contract executed in
Florida between two American corporations, either in 1965 or 1974 when the Acta was
executed.

  Chevron's complex argument for why the JOA's provisions apply to PetroEcuador
draws on diverse areas of both Ecuadorian and international law. The argument can
be broken down into three parts: (1) any requirement that government contracting
procedure needed to be followed is inapplicable in contracts assumed by the state
or its agencies; (2) the Ecuadorian constitution in 1974 allowed for the state or
its agencies to agree to engage in arbitration outside the confines of Ecuador; and
(3) that CEPE and PetroEcuador's course of conduct along with the universal
requirements of good faith and the 'actos proprios' doctrine (defined infra p. 21)
binds PetroEcuador to the JOA. [FN7]

  The Court finds the state of Ecuadorian law to have been too unsettled in 1974 for
the above propositions to support Chevron's position. Further, even if the Court
held that an Ecuadorian court would find Chevron's interpretation of the laws of
Ecuador correct, Chevron has proffered no evidence which shows that it actually
believed the JOA bound CEPE at relevant times. Indeed, evidence to the contrary has
been presented. Chevron's own expert states that this is fatal to any reasonable
expectation claim (to the extent it exists) under Ecuadorian law. This is to say,
that even in Chevron's best case scenario, it still cannot show that under
Ecuadorian law CEPE or PetroEcuador would have the JOA enforced against it because
there would be a lack of any reasonable expectation by Chevron that the JOA had

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                                        Page 9
6/26/2007 N.Y.L.J. 26, (col. 1)

continuing validity. Below the Court sets forth the arguments by the parties as to each issue in Chevron's analytical framework.

Government Contracting Procedure in Ecuador

The parties agree that Ecuadorian law mandates extensive formalities be followed before any government contract will be enforceable. There is no dispute that PetroEcuador and its predecessor CEPE are or were public entities. The parties disagree as to whether the formalities needed to be followed here, where CEPE bought out a signatory to a contract between two non-governmental entities. The question for the Court is would an Ecuadorian court require the parties to have complied with government contracting formalities for the JOA to bind PetroEcuador.

The parties agree that none of the formalities required in certain government contracts were followed. This would prove fatal to any claim as to the binding nature of the JOA only if the formalities were meant to be followed for a contract like the JOA. The extensive formalities for entry into a government contract for the drilling of oil included the following requirements: (1) the contract must be express; (2) in writing; (3) executed by the board and General Manager of CEPE after first securing a favorable report from the Attorney General, the Comptroller General, the National Security Council, the Joint Command of the Armed Forces; (4) consideration and approval from the President of Ecuador along with the Presidential authorization; (5) submission of all parties to the jurisdiction of Ecuadorian courts; (6) express waiver of any diplomatic protection by a foreign private party; (7) execution of a notarized contract; and (8) recordation of the contract with the hydrocarbons registry. (See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 31-32.)

PetroEcuador alleges that the formalities had to be followed or else any alleged contract is an absolute nullity because CEPE was a public entity entering into a contract for oil drilling (See Eguigueren/Albán Decl. ¶59.). Chevron disagrees on two grounds: (1) that the contract, if the formalities had to be followed, was later ratified under the civil law by PetroEcuador's course of conduct and (2) that the formalities did not need to be followed because this was not the type of contract contemplated by the code to require the relevant formalities.

Chevron presented the testimony of two Ecuadorian law experts regarding the formalities, Professor Luis Parraguez and Dr. Jorge Zavala. Professor Parraguez presented himself as an expert in Ecuadorian civil law of contracts. However, Professor Parraguez explicitly stated that he is not an expert in government contract law. (Foreign Law Hr'g Tr. at 217-18, May 22, 2007.) While it may be a truism that Professor Parraguez's testimony regarding the ratification of a null contract would only become relevant if the contract to be ratified was indeed null, the only way for the JOA to be null as a contract would be for it to be lacking in formalities, [FN8] which would place it under the purview of a government contract, an area where Professor Parraguez disclaims expertise. [FN9] Therefore for Chevron to carry the day here it must be that formalities are required for some contracts entered into by CEPE, a public entity, but that the provisions of this particular contract are ones that would not need to pass the above quoted approval.

To that end Chevron called Dr. Zavala, an expert in Ecuadorian law and a former

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                                    Page 10
6/26/2007 N.Y.L.J. 26, (col. 1)

Ecuadorian judge and professor. Dr. Zavala contends that CEPE is allowed to engage in both private and public contracting; the way to distinguish in which realm CEPE, or any other state agency is acting, is to look at the statute creating the agency, which gives it its purpose. (See Foreign Law Hr'g Tr. 284, May 23, 2007.) '[T]here is only an administrative function or purpose when administrative power is being exercised or authority is being exercised. ' (Id. at 285-86.) Dr. Zavala was then asked what power CEPE was using in 1974:

 A: ...CEPE being an entity of public law when in 1978 -- '74 it entered into the agreement, it had a public purpose, which was the exploration, production, transportation, marketing, storage of petroleum and gas, hydrocarbons.

 And in regards to those activities, CEPE was and has always been regulated or governed by public law. And I ratify what Dr. Eguigueren [PetroEcuador's expert] said that CEPE had two positions.

 On the one hand, in granting a concession on behalf of the state, and then another position which it adopted as a concessionaire, and CEPE decides to become part of the consortium as a result, when it joins the JOA, the concession agreement, it adopts the purposes of the JOA, which was to coordinate, to organize, and administer the activities of the concessionaires. That purpose, the purpose of the JOA, is not the specific purpose of CEPE or object of CEPE...

 So my position is, my view is, that within the concession, it had public power, a public purpose, and a public object. But in the JOA, when it operated with Texaco and Gulf and then thereafter just with Texaco, this was an activity without public authority, that is, a private activity, and in private activities such as submitting to the administrative rules and that activity of the JOA has an indirect activity -- has an indirect relationship to the purposes of the concession itself; that is to say, it's an instrument.

 (Id. at 286-87.) Dr. Zavala goes on to state that it is not the identity of the contracting party, but the purpose of the contract, which governs what area of the law the contract falls into. For example 'a private person does not become a public authority because he obtains authorization from the state. What matters is that a private person, [i.e.] Jorge Zavala, is exercising authority for a public purpose, and therefore is under public law.' (Id. at 289.) This point is well taken. But when applied to this case, the law as interpreted by Dr. Zavala becomes illogical. The purpose CEPE had was for the 'exploration, production, storage, and transportation of petroleum' (Id. at 389.) which was covered by the 1973 concession, therefore Dr. Zavalla believes the JOA was a contract not within CEPE's purpose and was 'made to be able to administer or organize that purpose, that object...between those parties [CEPE and Texaco]. ' (Id. at 390.) According to Dr. Zavala, CEPE was created to exploit oil fields, but any contract it signed to meet its purpose is purely incidental and hence just a matter of private contract law.

 CEPE's purpose is not to enter into partnerships. CEPE's purpose is to explore, produce, market, store, and sell hydrocarbons. That is the direct and immediate purpose. If it has to carry out other activities or enter into other contracts to achieve those purposes, it is then obvious that that [sic] for is an indirect purpose.

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                                Page 11
6/26/2007 N.Y.L.J. 26, (col. 1)

(Id. at 392.) A law of this sort is odd, at best. Any and all outsourcing then falls outside the purview of the extensive checks mandated by the nation's laws. Essentially, a crafty government employee could set up a corporation and, without any oversight, contract to exploit the natural resources of his country which the rest of the government was attempting to nationalize. While Dr. Eguiguren did in fact testify that CEPE was entitled to enter into private contracts without going through the formalities required in a government contract, Dr. Eguiguren limited the instances where this could occur to much more incidental decisions or contracts, such as contracts for uniforms, not contracts which enabled the governmental agency to carry out precisely what it was created to do.

Finally, PetroEcuador argues that the 1991 JOA was duly recorded in the hydrocarbon registry, while the 1965 JOA was not. (See Foreign Law Hr'g Tr. 380, May 23, 2007; ex. 72 (signature page of 1991 JOA showing registration).) The Court finds this fact compelling as evidence that a JOA would need to follow the formalities required by law, and is more than just a contract between two private parties when the state becomes involved. Coupled with the odd result contemplated by Dr. Zavala's interpretation of the government contract scheme in Ecuador, the Court is strongly inclined to side with PetroEcuador here: formalities would be required in a contract like the JOA. Because the formalities were not complied with, an Ecuadorian court looking back to 1974 would likely rule that the JOA was not binding on PetroEcuador. Even if formalities were not to be required in this instance by an Ecuadorian court, there is substantial disagreement amongst the experts as to whether the JOA, even if completely valid procedurally, would be constitutional.

Constitutionality of the Arbitration Clause in the 1965 JOA

After 1972's coup d'etat Ecuador's military government reinstituted the country's 1945 Constitution; this constitution was in effect from February 16, 1972, until August 9, 1979. (See Eguiguren/Albán Decl. at 22; Aff. of Rodrigo Jijón-Letort and Diego Pérez-Ordóñez at 2.) The 1945 Constitution contained a clause which read '[s]ubmission to a foreign jurisdiction shall be prohibited in all contracts executed in Ecuador by foreign parties with the Government or with public law entities.' (Id.) Arbitration has long been recognized as a means for settling disputes in Ecuador, but the question here is, assuming the JOA was otherwise valid and bound CEPE, would a court in Ecuador find that the prohibition of submission to a foreign jurisdiction include the public entity CEPE agreeing to arbitrate in New York pursuant to the rules of the AAA and governed by New York law? PetroEcuador alleges that submitting to any arbitration outside the physical borders of Ecuador would have been unconstitutional at the time that CEPE is alleged to have entered into the JOA. Chevron argues that arbitration, rather than litigation, outside of Ecuador is not submission to foreign jurisdiction. There are no cases directly on point from the Ecuadorian courts; thus this issue is again one of expert debate and analysis. [FN10]

Dr. Eguiguren testified that laws, when issued, must conform to the constitution; here, the applicable hydrocarbon law provided that CEPE's contracts could only be adjudicated by the courts of Ecuador. (Eguiguren/Albán Decl. at ex. 7; See Foreign Law Hr'g Tr. 36, May 21, 2007.) [FN11] This was because any adjudication outside of

6/26/2007 NYLJ 26, (col. 1)                                                        Page 12
6/26/2007 N.Y.L.J. 26, (col. 1)

Ecuador would violate the 1945 Constitution. Dr. Eguiguren states that
'international arbitrations are not courts of the country.' (Foreign Law Hr'g Tr.
45, May 21, 2007.) The hydrocarbons law requires the courts of Ecuador to exercise
their jurisdiction. (Id.)

Ecuador's 1998 constitution allows for submission to foreign jurisdiction for
arbitration in the case of international agreements. (See Foreign Law Hr'g Tr. 35,
May 21, 2007 (testimony of Dr. Eguiguren).) PetroEcuador argues that this means
that foreign jurisdiction included arbitration in 1974, hence the need to clarify
the availability of arbitration in foreign jurisdictions today.

PetroEcuador also presented the testimony of Professor Alejandro Garro who stated
that the 'arbitration clause, to the extent that it complies with the requirements
that are outlawed by the Constitution, are not valid nor enforceable in Ecuador and
no award rendered on the basis of such clause would be recognized or enforced in
Ecuador.' (Foreign Law Hr'g Tr. 406, May 24, 2007). Professor Garro's reading of
the 1945 Constitution and its bar on public entities entering into arbitration in
foreign jurisdictions was informed by reference to the 'Calvo Doctrine,' a 19th
century theory which posited that disputes with foreigners in Latin American
countries should be decided not by guns or by unsympathetic foreign courts but by
submission of the foreign nationals to the courts of the Latin American country.
(See Id. at 404- 06.) Professor Garro testified that 'Ecuador is definitely one of
the countries more reluctant to give up this 19th century view of Calvo which
forces disputes in which the state or instrumentalities intervene to be solved in
local courts and/or local law.' (Id. at 405.)

Professor Garro then stated that in theory, arbitration might never come before
the courts of a foreign jurisdiction. In practice, however, arbitration falls under
the jurisdiction of the courts when parties challenge arbitral jurisdiction, the
freezing of accounts, or the later enforcement of an arbitration award. (Id. at
410.)

Foreign jurisdiction in Ecuador is strictly defined by the locus of the event,
according to Professor Garro. Two Ecuadorians agreeing to conduct an arbitration in
a private conference room with Ecuadorian arbitrators using Ecuadorian law, if the
conference room is in Peru, would be a foreign arbitration, because it is taking
place beyond the physical borders of Ecuador. (Id. at 450.) Arbitration conducted
in Quito, Ecuador, with two New York parties using New York law and AAA rules would
not be foreign jurisdiction. (Id.) Professor Garro disagrees with Dr. Zavala that
the nationality of the arbitrators would have any effect on the foreign or domestic
nature of the arbitration. (Id. at 427; See Foreign Law Hr'g Tr. 310, May 23, 2007
(Zavala's direct testimony).)

Chevron's experts vigorously contest these points. Dr. Zavala argues arbitration
does not fall under foreign jurisdiction because it does not require submission to
a foreign sovereign power. (See Foreign Law Hr'g Tr. 298, May 23, 2007.)

When the Constitution of the Republic of Ecuador, in the many years it has been
referring to a foreign jurisdiction, has been referring to a principle whereby no
one who is part or belongs to the part of the sphere of the state can be subject or
under the jurisdiction of judges or courts in a foreign nation, and that had been

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                                            Page 13
 6/26/2007 N.Y.L.J. 26, (col. 1)

the prohibition or the limitation that had been imposed insofar as the state is
concerned.

 (Id.) Chevron's argument is not unreasonable as to the difference between
arbitration and submission to a court of a foreign jurisdiction directly,
particularly when viewing arbitration in an ideal setting where the courts need not
interfere. At the same time, Ecuador's later change of the Constitution to
expressly allow the type of arbitration sought here, as well as the removal of
arbitration clauses from JOA negotiations, cuts against Chevron's argument. (See
Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 7.) The state of the law of
Ecuador in 1974 on arbitral matters would be too unsettled for any reliance to be
reasonably maintained.

 Actos Proprios and International Law

 The final battleground amongst the experts is Chevron's contention that although
estoppel as understood by American courts does not exist in Ecuador, a close
approximation can be found in the actos proprios doctrine, or in maxims of
universal law. [FN12]

 Dr. Zavala summarized the actos proprios doctrine for the court and compared it to
estoppel.

 This is the same as the, as estoppel in Anglo-Saxon law, and I'm referring here
only to estoppel by representation, with a notable difference that explains this
issue.

 In estoppel by representation, as my U.S. colleagues know better, it's required
that the initial behavior provoke or that in reliance on that initial behavior the
other party engage in a behavior that is detrimental to them, and this is not
allowed by estoppel

 In the rule of actos proprios, it isn't required that the other party change its
course of action. It's only necessary or required that there be an initial behavior
by one party and not hearing whether the other party contradicts that behavior.

 (Id. at 321-22.) One can see how the actos proprios doctrine when paired with
Chevron's interpretation of the law and Facts of the instant case, would be an
appealing doctrine for defendants. Application of the actos proprios doctrine does
require an analysis of reasonable expectations of the parties, however, which
reliance the Court finds lacking here.

 Dr. Eguiguren does not disagree with Dr. Zavala's recitation of actos proprios,
but does not believe it should apply to the JOA. (See Foreign Law Hr'g Tr. 64, May
21, 2007.) Dr. Eguiguren states that the first time the actos proprios doctrine
appears in Ecuadorian law is 1994, which would be twenty years after the time
period this Court's hearing addressed. [FN13] (Id.) The Court need not resolve this
conflict because it finds that there could be no reasonable reliance on the JOA
even if the actos proprios doctrine was recognized in Ecuador in 1974.

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                              Page 14
6/26/2007 N.Y.L.J. 26, (col. 1)

Reasonable Reliance

 On the third day of expert testimony on Ecuadorian law the parties posed a series
of hypotheticals to Dr. Zavala. Dr. Zavala was of the belief that the JOA governed
the parties' course of conduct. In response to a hypothetical Dr. Zavala stated
that 'if I am Texaco and Gulf and were negotiating a new proposed JOA, I asked
myself, what rules are governing my relationship throughout all of this time. And I
come to the certain conclusion that it is the JOA.' [FN14] (Foreign Law Hr'g Tr. at
361, May 23, 2007.) When asked what would result if the Ecuadorian state or its
representatives had informed Gulf or TexPet that it was operating without an
agreement on an ad hoc basis, Dr. Zavala responded that it would not change his
opinion that there was a legally binding JOA because 'perhaps what is missing is
the legal, reliance on a written document, but not the expectations....they would
have a legitimate expectation that there was an agreement.' (Id.) Therefore the
focus of an Ecuadorian court's inquiry should not be on CEPE's belief, but on
TexPet's.

 When the hypothetical was changed to address the situation which occurred here,
where Gulf told TexPet that the parties were operating on an ad hoc basis, Dr.
Zavala's answer changed:

 Q: If the Gulf and Texaco employees complained that operations were impaired
because decision making was difficult because there was no legally binding joint
operating agreement, does that change your conclusion?

 A: If I have evidence that responsible officials or representatives had behaved in
the way that you describe.... Well, yes, I would lose the confidence that I had,
the expectation that I had, if I had proof that responsible parties felt that way.

 (Id. at 362.) PetroEcuador has submitted evidence that this occurred, where both
Texaco and Gulf complained about the oil drilling partnership which resulted from
the 1974 Acta. (See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 8.)

 In 1974, when CEPE began to take over Gulf's interest in the Napo concession,
through Gulf's final sale of its interest in 1977, Gulf expressed to the parties
the view that a new JOA should be negotiated, as it was of the belief that 1965 JOA
had been cancelled by the 1973 concession. (Id. at 42.) Gulf further advised the
parties that it had been operating on a de facto basis with Chevron since the 1973
concession without a functioning JOA while it was still a member of the three party
oil drilling group with Chevron and CEPE. (Id. at n. 29.) Gulf and Texaco's local
representatives in Ecuador sent their offices in the United States a joint telex
complaining about the ad hoc nature of the oil drilling operation since the 1974
Acta's enactment which made negotiations interminable. (Id. at 8.) TexPet's cash
call letters to PetroEcuador made no reference to the JOA, whereas its cash call
letters to Gulf did make reference to the JOA; Gulf would respond to TexPet's cash
call letters by advising it that it viewed the JOA as having been terminated. (See
Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 8.) The above Facts, taken as a
whole, mean that at the very least Gulf doubted the validity of the JOA when CEPE
began to replace it, and that Gulf had made Chevron aware of this.

 PetroEcuador's internal memoranda viewed the JOA as referential in nature, and

Copyright © 2008 The New York Law Pub. Co.

6/26/2007 NYLJ 26, (col. 1)                                              Page 15
6/26/2007 N.Y.L.J. 26, (col. 1)

expressed doubt as to whether PetroEcuador, short of signing a new JOA, could force
a change in the agreement to make itself operator. (See Pl.'s Mem. of Law in Supp.
of Mot. for Summ. J. at 10-11.) However, though PetroEcuador's own internal
analysis of the JOA serves to bolster the view that the JOA would not be found
binding, it is enough under Dr. Zavala's analysis for Gulf to have had internal
doubt. He believes one should look at behavior, not at the silence, of the
potentially estopped party when making a reasonable expectation analysis. (See
Foreign Law Hr'g Tr. at 356-57, May 23, 2007.)

 Lack of reasonable expectation on the part of Chevron would eliminate the need for
any universal maxims of law or any doctrines cited to by Dr. Zavala.

 Q: Let's assume, assume hypothetically, that it is proven to your satisfaction
[that Gulf and/or TexPet did not believe the JOA was binding]. In any of the
doctrines that you had in your declaration or the universal law of principles cited
by Professor Lowenfeld, are there any of these maxims or doctrines that would cause
you to believe that there was a binding [JOA] under those factual assumptions?

 A: Not on the basis of the fact that you described.

 (Foreign Law Hr'g Tr. at 362-63, May 23, 2007.)

 The Court then summarized a series of hypothetical questions which were posed to
Dr. Zavala, and the following colloquy took place:

 THE COURT: ...We are talking about whether under Ecuadorian law the [C]ourt would
hold the prior JOA continues as a binding contract, and you talk of, that there
would have to be actual or real expectations that there was an existing JOA in
force.

 And then the questions were asked as to what circumstances would support a
conclusion that there were reasonable expectations that there was an agreement.
Then you were asked if Gulf and Texaco complain that the operations were difficult
because there was no JOA what the consequence of that would be, and you said that
you would lose confidence. I take it lose confidence that there was a reasonable
expectation that there was an agreement in force if the responsible parties felt
that there was no agreement in force and that that was creating problems.

 My question is, does it make any difference whether Gulf and Texaco employees are
complaining amongst themselves or whether there is communicated to CEPE the view
that the absence of a JOA was creating problems?

 THE WITNESS: I will answer it. If there is a conviction, an understanding that
there is no JOA, there is no confidence that has been caused by the actions.

 THE COURT: And this is true regardless of whether Gulf and Texaco complain to CEPE
or whether this is something that they discuss among themselves?

 THE WITNESS: It would have been the same if they would have conversed among
themselves or stated that there was a lack of expectation or confidence of this

Copyright © 2008 The New York Law Pub. Co.

JOA. It would have been the same result.

 (Id. at 363-65.) Counsel for PetroEcuador expanded on Dr. Zavala's answers to the Court's questions with the following scenario, which mimics the events that took place from 1973 through 1977:

 Q: Would it add or detract or not influence your opinion if I added to this assumption, these assumptions, the assumption that during this period Gulf representatives in Ecuador, in writing, had written to Texaco employees stating that there was no JOA in place, and had put that writing, put that into letters to Texaco?

 A: Obviously the confidence would diminish.

 (Foreign Law Hr'g Tr. at 365, May 23, 2007.) Once Gulf or Texaco believed the JOA was not in force later discussions with PetroEcuador in order to sign a new JOA, or any course of conduct subsequent to the internal evaluation that the JOA would not apply, would have no effect.

 THE COURT: Now, the additional fact is that the parties were negotiating a new JOA, which would seem to strengthen the view that there was no existing JOA. [What result?]

 THE WITNESS: ...if one was confident that there was not a JOA in effect, and they continue negotiating for a new JOA, of course there is no confidence that there is a JOA in existence.

 (Id. at 368.) The course of conduct of the parties in their day to day operations becomes irrelevant if the party seeking to estop the government from denying the existence of a contract does not itself believe, for whatever reason, that the contract is binding on the government. That is the case here.

 Even if Chevron's analytical framework for binding CEPE were to hold (i.e. formalities were not required in this contract because it was a contract not for the express purpose for which CEPE was created, and an agreement to arbitrate in New York was constitutional), Chevron would still need the Court to find that PetroEcuador was bound to the JOA through its course of conduct via the actos proprios doctrine. The Court cannot do that because it finds that an Ecuadorian court would find no reasonable expectation on Chevron's part that the JOA would bind CEPE in 1974 to arbitration in America sought for the first time in 2004, and therefore there can be no arbitration.

 Summary Judgment Standard

 A court may grant summary judgment only where the moving papers and affidavits submitted by the parties show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Brown v. City of Oneonta, 106 F.3d 1125, 1130 (2d Cir. 1997).

Copyright © 2008 The New York Law Pub. Co.

Conclusion

 This Court is of the opinion that an Ecuadorian court would not find the JOA
binding on CEPE in 1974. Because an American court applying federal law would not
require arbitration if under Ecuadorian law this was not an available remedy, there
is no genuine issue as to the material fact of whether the JOA serves to bind
PetroEcuador. The Court need not engage in a determination of whether PetroEcuador
can be estopped under the American federal law of estoppel from denying that it is
bound to the JOA by its course of conduct because any reliance on a course of
conduct in Ecuador would be unreasonable.

 Therefore plaintiff's motion for summary judgment on defendant's counterclaims is
GRANTED to the extent that it implicates arbitration in New York; the Court GRANTS
plaintiff's request for a permanent injunction of the arbitration in New York; and
the Court DENIES defendants' motion for summary judgment on the permanent
injunction.

 The Court recognizes that there remains the issue of the 1995 Settlement, which
the Court did not dismiss in ROE I, after plaintiffs' stated that they would
withdraw their claims if they were victorious on their initial arbitrability issue.
See ROE I, 376 F. Supp. 2d at 375. Recognizing this, the Court will grant the
parties 60 days to evaluate their posture and confer with each other, at which
point they are to advise the Court in a status letter what further proceedings, if
any, they intend to pursue before this Court..

 SO ORDERED.

FN1. PetroEcuador contends that the 1974 Acta specifically contemplated execution
of a JOA at a later date because it provided that all the activities to be
performed 'shall be ruled by an Operation Agreement to be subscribed to by the
parties.' (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 6.)

FN2. PetroEcuador alleges that the JOA was completely abolished as the result of a
1973 contract (which replaced the Napo concession) because it was ancillary to the
Napo concession and was thus abolished alongside it. ROE I, 376 F. Supp. 2d at 340;
Pl.'s Mot. for Summ. J. at 41. The Court does not rest its decision on this ground
and will not address how an Ecuadorian Court would rule on this ancillary contract
claim.

FN3. Inexplicably, over the entire course of this three year litigation neither
party has alleged that the 1991 JOA, which has no arbitration clause in it,
supersedes the 1965 JOA or in any way governs this dispute. The Court asked the
parties whether they intended to make any arguments along these grounds:

 THE COURT: And is there an argument being made that whatever existed prior to
that time [pre-1991] the 1991 JOA now controls?

 MR. CULLEN [Chevron's attorney]: No, your Honor. There is a specific provision
in the 1991 JOA that it shall control as of this date forward, as of the date of
its execution for the operation.

Copyright © 2008 The New York Law Pub. Co.

MR. MITCHELL [Ecuador's attorney]: Actually, your Honor, we had not considered that point. That is one of the -- every time you turn around and look in this case another issue pops out, and frankly that is one that I had not thought about. Maybe I should have, but I haven't.

(Foreign Law Hr'g Tr. at 473, May 24, 2007.) Therefore the Court will treat any argument along these lines to have been waived.

FN4. The procedural history of the Aguinda litigation is detailed in Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002), and Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998). In Aguinda the Second Circuit found that the courts of Ecuador were perfectly capable of handling a tort claim. Id. at 477. This Court notes that the parties have assumed the other's respective position on forum for this litigation. In the Lago Agrio line of cases, Chevron preferred to have the courts of Ecuador hear the case instead of the courts of the United States and the Ecuadorian party wanted to keep the case in the United States. The extent to which the reversal of positions results from changes in the Ecuadorian government is not disclosed.

FN5. The parties referred to TexPet alternately as Texaco both in their papers and at the hearing.

FN6. Both parties have expanded the issues beyond binding arbitration through estoppel and now also make conflicting arguments as to whether or not PetroEcuador can be bound through assignment of the 1965 JOA. This has raised more issues of Ecuadorian law as well.

FN7. Naturally, PetroEcuador and Ecuador disagree with all three of these points. They allege that: (1) any agreement with CEPE, like the JOA, would be a public contract (except in very limited circumstances), which means that a series of formalities mandated by Ecuadorian law must be followed, none of which were followed here; (2) arbitration in New York subjects Ecuador to foreign jurisdiction which was forbidden at the time by the Ecuadorian constitution; and (3) the actos proprios doctrine and the universal maxims proffered by Chevron have no bearing on the current dispute given Ecuador's own local law.

FN8. The contract could also be unconstitutional; the unconstitutional grounds for the contract are discussed, infra p. 18, with regards to whether the constitution in place in 1974 would have permitted CEPE to submit itself to foreign arbitration. As will be seen below, the relevance of the constitution only arises if CEPE is a state entity, which means that government contract formalities would once again be implicated.

FN9. Any possible ratification of the JOA through PetroEcuador's course of conduct is addressed in the analysis of the actos proprios doctrine, infra p. 21. Further, if the JOA was a contract purely between two private parties, then the actos proprios doctrine would apply as well.

FN10. The parties argue as to the relevance of several Ecuadorian cases, all of which the Court finds to be no more than dicta. (See Foreign Law Hr'g Tr. 112, May 21, 2007.)

Copyright © 2008 The New York Law Pub. Co.

FN11. The law reads:

   Foreign companies willing to execute contracts contemplated [under the
Hydrocarbons Law] must establish domicilie in the country and comply with all
requirements prescribed in applicable laws. These Foreign companies shall be
subject to the jurisdiction of the country's courts and shall expressly waive their
rights to file a claim by diplomatic channels. Such jurisdiction and waiver shall
be impliedly included in any contract entered into with the State or CEPE

   (Hydrocarbons Law of 1971, Art. 24; Eguiguren/Albán Decl. at ex. 7). By 1974
this provision of the hydrocarbons law had been moved to article 25 but contains
the exact same wording. (Id. at ex. 8.)

FN12. Professor Andreas Lowenfeld testified on the potential use of maxims of
universal law for gap filling by the courts. As one can see there is disagreement
amongst the experts as to how the Court should interpret the laws of Ecuador;
universal maxims, though of interest, do not solve the question before the Court.

FN13. Perhaps this explains why no mention of the doctrine was made until the Court
requested papers from the parties.

FN14. PetroEcuador contends that the 1973 concession, the 1974 Acta, various
operations manuals Texaco had covering payroll and other day to day issues, and
certain Ecuadorian hydrocarbon laws were used to govern the oil drilling during
this period. (See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 9.)

6/26/2007 NYLJ 26, (col. 1)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.