UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
BARRACK, RODOS & BACINE,

                          Plaintiff,

                                            Case No. 08 CV 02152 (PKL)
    -against-


BALLON STOLL BADER & NADLER, P.C.,

                          Defendant.
---------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTIONS FOR
<u>DISMISSAL AND SUMMARY JUDGMENT</u>**

**<u>Preliminary Statement</u>**

       This Memorandum of Law is respectfully submitted by the Defendant, Ballon Stoll Bader & Nadler, P.C. ("BSBN"), in opposition to the motions submitted by Plaintiff, Barrack Rodos & Bacine ("BR&B"), for dismissal of Plaintiff's Counterclaims and for Summary Judgment on its Complaint for Declaratory and Injunctive relief.

       The facts as they relate to Plaintiff's applications and Defendant's opposition are succinctly set forth in BSBN's Responsive Rule 56.1 Statement (the "BSBN Statement"). Briefly, BR&B seeks to enjoin BSBN from proceeding against it in Arbitration upon the ground that BR&B is not a party to any arbitration agreement with BSBN.

       At the center of the parties' dispute is an Arbitration pending before the American Arbitration Association and styled *Ballon Stoll Bader & Nadler, P.C. Claimant v. A. Arnold Gershon & A. Arnold Gershon, P.C., Respondents and Barrack, Rodos & Bacine, Stakeholder-Respondent,* AAA Claim No. 13 194 01780 07 (the "Arbitration").[1] By way

---

[1] On March 20, 2008, this Court preliminarily enjoined BSBN from pursuing Arbitration as against BR&B.

of Arbitration, BSBN seeks an award of its proportionate share of attorneys fees awarded to "plaintiff's counsel" on May 23, 2007 in a certain stockholder derivative suit brought in the U.S. District Court of the District of Delaware styled *Seinfeld v. Barrett, et al.*, Case No. 05-298 (JJF)(D. Del., May 16, 2005) (the "Intel Action" or "Intel").  Intel was initiated by A. Arnold Gershon / A. Arnold Gershon, P.C. ("Gershon") while Gershon was "Of Counsel" to BSBN pursuant to an Agreement containing a mandatory arbitration provision (¶¶10, 11 & 15[2]).  Gershon terminated the Of Counsel Agreement with BSBN and joined BR&B as a partner prior to the award and payment of the Intel Fees (¶¶17-20).  Gershon continued to prosecute Intel through BR&B.  BSBN claims a proprietary interest in the Intel Fees which, pursuant to the Intel Court's direction, were delivered to BR&B.

BSBN asserts that BR&B is bound pursuant to various equitable principles to the arbitration clause contained in the Of Counsel Agreement.  BSBN also asserts that, even if BR&B cannot be compelled to arbitrate, this Court should enter Judgment for BSBN requiring that BR&B pay over to BSBN so much of the Intel Fees as are awarded to BSBN in the Arbitration.

**Summary of Motions and Opposition**

BR&B, in two separate motions, seeks the following relief:

(a) Dismissal of the Second, Fourth, Fifth and Sixth Counterclaims on justiceability/ripeness grounds;

(b) Dismissal of each of the Counterclaims under FRCP Rule 12(b)(6), for failure to state any claim upon which relief may be granted;

---

[2] Paragraph references are to the BSBN Statement.

(c) Judgment permanently enjoining BSBN from proceeding against BR&B in Arbitration; and

(d) Summary dismissal of BSBN's First Counterclaim.

As demonstrated below, both of the Motions must be denied, in their entirety.

## POINT I

### THE COUNTERCLAIMS ARE NOT BARRED ON JUSTICIABILITY GROUNDS

Plaintiff's cursory discussion of justiciability and the "Ripeness Doctrine" is curiously devoid of any analysis of the relationship of BSBN's claims to that doctrine. The reason is clear – controlling case law dictates that BSBN's claims must survive the analysis.

> **"[R]ipeness is peculiarly a question of timing."** *Regional Rail Reorganization Act Cases, supra,* **419 U.S., at 140, 95 S.Ct., at 357. "[I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."** *Abbott Laboratories v. Gardner,* **387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)…… *581 occur as anticipated, or indeed may not occur at all." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532 (1984). …..**
>
> **In addition, "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration" must inform any analysis of ripeness.** *Id.,* **at 149, 87 S.Ct., at 1515. …..**

Thomas v. Union Carbide Agr. Products Co., 473 U.S. 568, 380-582, 105 S.Ct. 3325 (1985).

Rather than looking to the line of cases relied upon by the Plaintiff, in which the Courts were called upon to determine constitutionality of statutory or regulatory

3

enactments, authorities assessing justiciability of issues arising in insurance litigation is instructive to the inquiry at hand.

In Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 61 S.Ct. 510 (1941) the Supreme Court was called upon to determine whether a justiciable controversy existed as to its prospective obligation to indemnify its insured. There, an action in tort was brought against the Plaintiff's insured for injuries resulting from an accident. The applicable state law provided that, if the claimant was awarded a judgment against the insured, that judgment could be enforced against the insurer. Maryland Casualty brought an action against both the insured and the tort claimant seeking a declaration of non-coverage. Notwithstanding the fact that no judgment had been rendered against the insured and no claim against the insurer was lodged, the Supreme Court held that an actual controversy existed between claimant and the insurance company.

The Maryland Court analyzed the requirements and intent surrounding the "actual controversy" limitation of the Declaratory Judgment Act:

> **The question is whether petitioner's allegations are sufficient to entitle it to the declaratory relief prayed in its complaint. This raises the question whether there is an 'actual controversy' within the meaning of the Declaratory Judgment Act, Judicial Code § 274d, 28 U.S.C. § 400, 28 U.S.C.A. § 400, since the District Court is without power to grant declaratory relief unless such a controversy exists. Nashville, etc., Ry. Co. v. Wallace, 288 U.S. 249, 259, 53 S.Ct. 345, 346, 77 L.Ed. 730, 87 A.L.R. 1191; U.S.C.A. Constitution, Art. III, s 2.**
>
> **The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient**

4

> **immediacy and reality to warrant the issuance of a declaratory judgment. See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-242, 57 S.Ct. 461, 463, 464, 81 L.Ed. 617, 108 A.L.R. 1000. It is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case. Nashville, etc., Ry. Co. v. Wallace, supra, 288 U.S. page 261, 53 S.Ct. page 347, 77 L.Ed. 730, 87 A.L.R. 1191.**

*Id.* at 312 U.S. 272-273.

Here, BR&B has clearly expressed its position that the Intel Fees were awarded to BR&B and belong to BR&B, and that BSBN has no proprietary interest in those fees. BSBN asserted its Charging Lien against the Intel Fees, and BR&B has openly refused to acknowledge the existence of BSBN's perfected security interest via its charging lien, which is subject only to fixing of the lien amount. Arbitration is ongoing between BSBN and Gershon for a determination of BSBN's monetary interest in the Intel Fees. At a minimum, there are justiciable controversies between the parties as to the validity of the Charging Lien, whether BSBN retains an ownership interest in the Intel Fees and whether BSBN may look to BR&B for satisfaction of any award rendered by the Arbitrator in its favor and against Gershon (¶¶22-26).

Accordingly, Plaintiff's motion for dismissal of the Second, Fourth, Fifth and Sixth Counterclaims on "ripeness" grounds must be denied.

## POINT II

## BR&B IS REQUIRED TO ARBITRATE

Both the Summary Judgment motion, in its entirety, and the Dismissal Motion, in part, are premised upon BR&B's assertion that it is not bound by the arbitration provisions of the Of Counsel Agreement. BR&B therefore seeks (a) a permanent injunction, preventing arbitration of BSBN's claims of entitlement to any portion of the fees and expenses received by BR&B on account of cases which brought by Gershon from BSBN to BR&B and (b) dismissal of BSBN's First Counterclaim, seeking declaratory relief which, if granted, would obligate BR&B to arbitrate.

Notwithstanding this Court's prior decision, granting a preliminary injunction, the developing facts clearly disclose that permanent relief is not appropriate. Rather, the First Counterclaim is meritorious and should stand.

### A. Non-Signatories May Be Bound

While the general rule is that non-signatories to an otherwise valid arbitration agreement cannot be compelled to arbitrate, both the State and Federal Courts sitting in New York have recognized and implemented exceptions to this rule. In Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2nd Cir. 1995), the, the Second Circuit opined that it is "clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.' *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980)." The Court expressly recognized five (5) theories arising under "ordinary principles of contract and agency" pursuant to which a non-signatory may be bound to arbitrate, namely: "1) incorporation

6

by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." _Id._ at 776.

In Judge Sand's recent decision in Republic Of Ecuador v. Chevrontexaco Corp, 499 F.Supp.2d 452 at 457 (SDNY, 2007) the validity of the Thomson-CFS criteria was expressly confirmed:

> Under federal common law, the Second Circuit 'has recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.' Thomson-CSF, S.A. v. American Arbitration Association, 64 F.3d 773, 776 (2d Cir. 1995). '[A] willing signatory (such as [TexPet]) seeking to arbitrate with a non-signatory that is unwilling (such as [PetroEcuador]) must establish at least one of the five theories described in Thomson-CSF. ' Merrill Lynch Inv. Managers, 337 F.3d [125,] at 131 [(2d Cir 2003)…Of the five Thomson-CSF theories, the most likely to apply in this case is estoppel. 'A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause.' American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (citing Thomson-CSF, 64 F.3d at 778-79). Direct benefits are those 'flowing directly from the agreement…

The inquiry therefore must be whether, under any of the five theories, BR&B may be bound by the BSBN-Gershon Arbitration Agreement.  BSBN asserts three bases upon which BR&B's obligation to arbitrate must be found.

### B. **Application of the Estoppel Theory**

"Under the estoppel theory, a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement.'" MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC, 268 F.3d 58 (2nd Cir. 2001)   Application of an estoppel theory is dependant upon whether the non-signatory received a "direct benefit" from the agreement containing the arbitration

7

clause. American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2nd Cir. 1999). Direct benefits have been found to include use a trade name granted by an agreement (Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060 (2nd Cir. 1993)) significantly lower insurance rates and the ability to sail under the French flag by reason a contract between a shipbuilder and an accrediting agency. American Bureau of Shipping v. Tencara Shipyard S.P.A., *supra* at 353.

In contrast benefits are indirect when "the agreement was not the direct source of the benefit… [flowing instead] from the non-signatory's exploitation of the contractual relation created through the agreement…" MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC, *supra* at 61-62.

> **Under the estoppel theory, a company "knowingly exploiting [an] agreement [with an arbitration clause can be] estopped from avoiding arbitration despite having never signed the agreement." [*Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 778 (2d Cir. 1995)*]. Guided by "ordinary principles of contract and agency," we have concluded that where a company "knowingly accepted the benefits" of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)* (internal quotation marks and citation omitted). The benefits must be direct -- which is to say, flowing directly from the agreement. *Thomson, 64 F.3d at 779*. Deloitte, for example, concerned an agreement containing an arbitration clause which governed the terms of use of a trade name. A nonsignatory who had received a copy of the agreement, raised no objections to it and made use of that trade name pursuant to the agreement was estopped from arguing it was not bound by the arbitration clause in the agreement. *Deloitte, 9 F.3d at 1064***

1. Here, BR&B, knowingly accepted the benefits of the Ballon-Gershon Agreement. With full knowledge of the contents of that Agreement and of the resulting dispute over ownership of the Intel Fees, BR&B advocated payment of the Intel Fees to

8

its Philadelphia, Pennsylvania office (¶¶3-4). Any interest of BR&B in and to those fees arose from Gershon's assignment of fees to BR&B as of December 1, 2008, having agreed that "all fees generated by [Arnold] on behalf of [Arnold's] clients and [BR&B's] clients during [Arnold's] association with [BR&B] are the property of Barrack Rodos & Bacine" (¶21). BR&B even agreed to indemnify the Intel defendants "as to any attempt by Ballon, Stoll to extract any fees from them."(¶4). Since the Of Counsel Agreement provides, in Article Ninth, that, upon termination thereof,

> **(b) All collections for services rendered prior to the termination of this Agreement and received by the Firm or [Gershon], after the termination date of this Agreement, shall remain the property of the parties as their interests are expressed in this Agreement. [Gershon] and the Firm shall share in said collections as set forth in Fee Schedule "A" hereof.**

(¶13), BR&B necessarily benefited directly from the Of Counsel Agreement in that it became the "owner" of Gershon's interest in the Intel Fees.

### C. BR&B Succeeded to Gershon's Interest under the Of Counsel Agreement.

Applying foregoing principles, the Appellate Division, Second Department in AT & S Transp., LLC v. Odyssey Logistics & Technology Corp., 22 A.D.3d 750, 803 N.Y.S.2d 118 (2nd Dep't 2005) found that under circumstances that evince a successorship, the non-signatory successor may be compelled to arbitrate pursuant to an arbitration agreement between the predecessor and a third party. There, AT&S sought to compel Odyssey to arbitrate pursuant to an agreement which had been entered into between AT&S and two other parties. The two parties to AT&S' Arbitration Agreement subsequently entered into an "asset transfer agreement" with Odyssey. When AT&S

9

sought to enforce its arbitration agreement as to Odyssey, Odyssey resisted, claiming it was not bound "because it was not a party, an assignee, or a successor" to the AT&S agreement.

The Appellate Division, Second Department upheld the trial court's determination that Odyssey was bound by the arbitration agreement, fining that a "*de facto* merger had resulted from the asset transfer agreement. In doing so, the Court held as follows:

> **The hallmarks of a de facto merger are the "[c]ontinuity of ownership; cessation of ordinary business and dissolution of the predecessor as soon as possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and, a continuity of management, personnel, physical location, assets, and general business operation" (Fitzgerald v. Fahnestock & Co., 286 A.D.2d 573, 574, 730 N.Y.S.2d 70). <u>These factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor</u> (see Nettis v. Levitt, 241 F.3d 186;City of New York v. Pfizer & Co., 260 A.D.2d 174, 688 N.Y.S.2d 23). [emphasis added].**

*Id.* at 22 A.D.3d 752.

Discussing the factors considered in reaching its determination, the Court opined:

> **…AT & S presented sufficient evidence to establish all four factors needed to demonstrate the existence of a de facto merger. Pursuant to the transfer agreement between Odyssey, Rely, and Acquisition Corp., in consideration for the transfer of shares of Odyssey stock, substantially all of the assets of Rely and Acquisition Corp. were purchased or licensed by Odyssey. The real property of the predecessor corporation was transferred or assumed by Odyssey. Odyssey offered employment to its predecessor's employees, hired two of its predecessor's management personnel, assumed the contracts of independent contractors, agreed to honor the predecessor's customer service contracts, and received the predecessor's business insurance policy. …The fact that Rely did not immediately liquidate is not dispositive. So long as the acquired corporation is shorn of its assets and has become, in**

10

> **essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made (see Fitzgerald v. Fahnestock & Co., supra at 576, 730 N.Y.S.2d 70;Ladenburg Thalmann & Co. v. Tim's Amusements, 275 A.D.2d 243, 248, 712 N.Y.S.2d 526).**

*Id.* at 22 A.D.3d 752-753.

Here, AAG's sole assets as of December 1, 2008 were (a) Arnold's services and (b) fees derived from Arnold's services.[3] Both of those assets were conveyed to BR&B. When Arnold joined BR&B, both of those assets were conveyed and assigned to BR&B (¶¶20-21). BR&B also hired the two BSBN employees who were designated by BSBN as Gershon's staff, replaced BSBN as counsel with respect to pending cases brought by Arnold to BR&B (including Intel) and assumed the obligations of AAG and BSBN under their agreements to compensate local counsel, including Fox Rothschild.

There can be no dispute that, upon termination of the Of Counsel Agreement, AAG was "**shorn of its assets and has become, in essence, a shell.**" Since AAG merged into and was subsumed by BR&B, this Court should find that BR&B is bound under the *de facto* merger doctrine to arbitrate.

### D. Ownership of the Intel Fees

BR&B's position in this regard is unavailing. The Of Counsel Agreement is clear on its face. Gershon had no legal or equitable right to dispose of, assign or hypothecate any portion of those fees to which BSBN claimed and interest. BR&B and Arnold expressly advised BSBN that their "**request as to whether [BSBN] should make a separate fee application, our answer is that it is unnecessary and improper.**" (¶24).

---

[3] Under the express terms of the Of Counsel Agreement, AAG was prohibited from undertaking legal work other than through BSBN.

11

BR&B's admonition of BSBN for neither attending the hearing nor applying to the Intel court for a fee is disingenuous. Moreover, the fee application submitted by BR&B included the "Lodestar" amount earned by BSBN (¶¶4&19). Finally, BR&B proffers an interpretation of the Intel Judgment which is contrary to its plain language.

### POINT III

### THE COUNTERCLAIMS ARE FACIALLY SUFFICIENT

**A. The Fraudulent Conveyance**

BSBN's claim is sufficiently pleaded. It is clearly premised upon the conveyance by Gershon to BR&B of AAG's right to receive fees, including those anticipated in Intel.

A conveyance may be deemed fraudulent without the element of *scienter*, or the traditional fraudulent intent. Paragraphs 39, 40, 43 and 45 of the Answer adequately form the basis for a claim under New York's Debtor & Creditor Law. Indeed, since the Of Counsel Agreement apportions the rights to fees between BSBN and AAG, and since AAG was divested of any interest in those fees and of the entirety of its assets upon Arnold's association with BR&B, AAG was insolvent as defined therein.

**B. Money Had and Received and Unjust Enrichment**

BR&B's convoluted logic also cannot succeed in defeating the Fourth and Fifth Counterclaims. BSBN has clearly pleaded that it is entitled to a portion of the Intel Fees, that BR&B received the Intel Fees and that BSBN performed work valued at $291,238.75 and incurred disbursements of $5,328.52 upon which a portion of the Intel Fees are based. Without more, a claim has been adequately stated.

### C. The Charging Lien

BR&B has set forth no set of facts or documentary evidence which supports their claim that a cause of action to enforce a charging lien cannot be asserted. BSBN claims a lien based upon work performed in New York and fees generated from that work. That those fees were improperly diverted is of no moment.

Moreover, the Charging Lien was asserted under both the NY Judiciary Law and under the Law of the State of Delaware. Defendant is aware of no legal authority which would prevent a federal court sitting in New York from declaring enforceable a Charging Lien under Delaware Law.

### Conclusion

For all of the foregoing reasons, the motions must be denied.

Dated: New York, New York
June 13, 2008

>BALLON STOLL BADER & NADLER, P.C.
>*Attorneys for Defendant*
>
>By: _____
>     Susan Schneiderman (SS9840)
>729 Seventh Avenue, 17th Floor
>New York, New York  10019
>212-575-7900
>(fax) 212-764-5060
>sschneiderman@ballonstoll.com